David S. Stone
Robert A. Magnanini
STONE & MAGNANINI LLP
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
Tel:    (973) 218-1111
Fax:    (908) 464-3010 or (908) 464-1020
dstone@stonemagnalaw.com
rmagnanini@stonemagnalaw.com

*Attorneys for Plaintiff-Relator*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* [UNDER SEAL], <br><br> Plaintiff, <br><br> v. <br><br> [UNDER SEAL], <br><br> Defendant. | Civil Action No. _____ <br><br> **COMPLAINT** <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** <br><br> **DEMAND FOR JURY TRIAL** |

David S. Stone
Robert A. Magnanini
STONE & MAGNANINI LLP
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
Tel: (973) 218-1111
Fax: (908) 464-3010 or (908) 464-1020
dstone@stonemagnalaw.com
rmagnanini@stonemagnalaw.com

*Attorneys for Plaintiff-Relator*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* GREGORY BORIS, <br><br> Plaintiff, <br><br> v. <br><br> LOCKHEED MARTIN CORPORATION, <br><br> Defendant. | Civil Action No. _____ <br><br> **COMPLAINT** <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** <br><br> **DEMAND FOR JURY TRIAL** |

On behalf of the United States of America, Plaintiff-Relator, Gregory Boris (hereinafter

"Boris" or "Relator"), by counsel, files this *qui tam* Complaint against Lockheed Martin

Corporation ("Lockheed Martin" or "Defendant"), and alleges as follows:

## I. INTRODUCTION

1. This is an action to recover treble damages and civil penalties on behalf of the

United States of America from Defendant for knowingly and/or recklessly presenting or causing

1

to be presented false claims to the U.S. Government through the Department of Defense ("DoD") in violation of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*

2.      From at least 2007, and as far back as 2002, to the present, Defendant has knowingly billed the United States government for unauthorized overtime services in violation of clear provisions in the relevant defense contracts. Once Defendant became aware that such claims were in violation of the defense contracts, Defendant failed to report or halt billing for overtime services, and failed to return improperly obtained payments for overtime services previously billed. As a result, the United States has suffered damages exceeding $100,000,000 in unauthorized overtime costs.

3.      Defendant is the prime contractor for several defense contracts from the DoD, as specified by the vehicle name and contract number (collectively referred to as the "defense contracts" or "contracts"):

   (1)     CR2- CECOM Rapid Response (DAAB07-03-D-B009);

   (2)     S3- Strategic, Services, Sourcing (W15P7T-06-D-E405);

   (3)     R23G – Rapid Response Third Generation (W15P7T-10-D-D414, successor to CR2-Final).

   (4)     R2CSR – Rapid Response CSR (DAAB07-98-D-H503, predecessor contract to CR2);

   (5)     CNTPO-Counter Narco-Terrorism Program Office  (W9113M-07-D-0006);

   (6)     FAST (F09603-01-D-0207);

   (7)     FAST 2 (FA8530-08-D-0008); and

   (8)     DESP II (FA8222-06-D-0004).

2

4. Defendant's responsibilities as the prime contractor required Defendant to initiate, organize, and supervise the implementation of the defense contracts by hiring and managing subcontractors. As part of their duties, Defendant was required to ensure that all work was done properly, on-time, and according to the specifications detailed within the defense contracts. Once work had been completed by either Defendant or by subcontractors, Defendant was required to authenticate all claims and bills before submitting them to the DoD for payment.

5. However, beginning in at least 2007, and likely since 2002, when the contracts were entered into with Defendant and Defendant's subcontractors began routinely billing for thousands of hours in overtime, worth over $100,000,000. Defendant submitted the unauthorized overtime billings mixed in with other claims to the DoD for payment without disclosing that they had never been approved in advance, as required by the contracts. These unauthorized claims were then paid by DoD.

6. In October, 2010, in the course of reviewing work on a new assignment, Relator examined the defense contracts and discovered that the contracts prohibited Lockheed Martin and its subcontractors from billing for overtime without prior approval by the Contract Officer. Despite this fact, Relator found numerous records showing that Defendant had routinely submitted claims for unauthorized overtime. Relator reported his findings concerning these improper claims to several Lockheed Martin managers and specialists, including Contract Administrator, Daniel Monti; Manager-Contracts, Gregory Roe; Director-Program Management Office, Jeff Terhune; and Program Managers, Jeff Stavash and Martin Delaney. Upon discovering that unauthorized overtime had been billed for in violation of the defense contracts,

3

Relator was asked to determine how much unauthorized overtime had been billed and the extent of Lockheed Martin's exposure.

7.      Relator reviewed and examined a small segment of billings solely from subcontractors in Defendant's Vendor Invoice Processing ("VIP") system and determined that over 200,000 hours in overtime had already been billed and paid. The VIP system was only put into use by Defendant in 2007. Furthermore, Relator discovered that overtime was continuing to be billed and submitted to the DoD for payment without prior approval. Relator reported his findings to the same group of Lockheed Martin managers and specialists.

8.      On or about October, 2010, a Lockheed Martin employee, Manager-Contracts Gregory Roe, spoke with one of the U.S. government Contract Officers responsible for supervising Lockheed Martin's defense contracts and inquired whether or not recently-incurred unauthorized overtime could be approved under these contracts. The Contract Officer told him that the overtime would not be approved. Mr. Roe then asked whether or not previously-submitted unauthorized overtime could be approved after the fact, and the Contract Officer told him that any overtime which had not been approved beforehand would not be approved after the fact.

9.      Instead of following proper procedure and reporting to the DoD Contract Officer that Defendant, based on a sample query, had billed at least 200,000 hours of unauthorized overtime in violation of the defense contracts, Defendant concealed this information from the U.S. government, DoD, and the DoD Contract Officer.

10.     Afterwards, Relator inquired about what had occurred at the meeting with the DoD Contract Officer and what the new policy regarding overtime was. Relator did not receive a

4

definitive response, but was told that the issue was under review. Subsequently, in retaliation for his discovery of the unauthorized overtime and his advocacy that Defendant should report the unauthorized overtime to the U.S. Government, Relator was subsequently transferred to non-managerial roles and then ultimately laid off without cause.

11.     Defendant has actual knowledge that they have illegally billed the DoD for at least over 200,000 hours of unauthorized overtime, and that improper billings would be disallowed and need to be refunded to the government. Defendant has concealed this information and has failed to comply with the terms of the defense contracts, preferring instead to profit off of the unauthorized overtime billings.

12.     Relator submits, upon information and belief, that the Defendant has caused a total actual loss to the United States in excess of \$100,000,000.

## II.     JURISDICTION AND VENUE

13.     The United States District Courts have exclusive jurisdiction over actions brought under the FCA pursuant to 31 U.S.C. §3732, and otherwise have jurisdiction under 28 U.S.C. §§1331 and 1345. At all times relevant hereto, the Defendant regularly conducted substantial business in the State of New Jersey and maintained and operated offices in Cherry Hill and Mt. Laurel, New Jersey as part of their Mission Systems and Training operations. Accordingly, the Defendants are subject to personal jurisdiction in New Jersey. Venue is appropriate in the District of New Jersey pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391(b)(1) and (2).

14.     Section 3732(a) of the FCA provides that "any action under Section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by

5

Section 3729 occurred." The acts complained of herein occurred throughout the United States, the State of New Jersey and within the geographic area encompassed by the United States District Court for the District of New Jersey.

15.  Under the FCA this Complaint is to be filed *in camera* and remain under seal until the Court orders otherwise.

## III.  DEFENDANT

16.  Lockheed Martin Corporation is a Maryland corporation with its principal place of business located at 6801 Rockledge Drive, Bethesda, MD 20817. Lockheed Martin is a global security and aerospace company principally engaged in the research, development, and manufacture of advanced technology systems and services for defense applications. Lockheed Martin develops, manufactures, and provides services throughout the United States of America, and maintains significant operations regarding Mission Systems and Training in Cherry Hill and Mt. Laurel within the State of New Jersey at all times relevant to this matter.

## IV.  PLAINTIFF-RELATOR

17.  Plaintiff-Relator Gregory Boris is a citizen of the United States and the State of New Jersey.

18.  Relator Boris was employed by Lockheed Martin from 2010 to 2015 as a Multi-functional Finance Manager and Multi-functional Senior Financial Analyst. In this capacity, Relator Boris' responsibilities included oversight for several defense contracts. Relator Boris has direct knowledge of the facts related herein and is the original source of same. While he is unaware of any of the Counts, fraud allegations and/or acts described herein in violation of 31 U.S.C. §3729 having been publicly disclosed as contemplated under 31 U.S.C. §3730(d)(4)(B),

6

he has made voluntary disclosure of substantially all evidence and information in his possession to the authorities responsible for investigating these allegations prior to filing this Complaint and is an original source of the information contained in the Complaint.

## FACTS

## A.    Lockheed Martin Serves as the Prime Contractor for the Defense Contracts

19.    Lockheed Martin was formed in 1995 when the Lockheed Corporation merged with the Martin Marietta Corporation. Since then, it has grown to become the largest defense contractor in the world focusing on aerospace, defense, and security products and services. In 2014, Lockheed Martin generated \$45.6 billion in net sales, 79% of which came from the U.S. Government, either as a prime contractor or as a subcontractor.

20.    When operating as a prime contractor, Lockheed Martin enters into a direct contract between itself and the DoD or U.S. Government to provide materials, equipment, or services. As a prime contractor, Lockheed Martin is required to assign secondary jobs and responsibilities to lower-tier subcontractors as necessary to complete the defense contract. When serving as a prime contractor, Lockheed Martin also provides information regarding roles and responsibilities to subcontractors, and reviews any materials, equipment, or services provided by subcontractors to confirm that they meet the contracting standards.

21.    Most importantly, as the prime contractor, Lockheed Martin is required to examine and certify all claims presented by itself and subcontractors to DoD or the Federal Government ensure that all work was properly done and that all claims are accurate and meet the contract provisions standards.

7

**B.     Lockheed Martin served as the Prime Contractor for Several Defense Contracts, Each Containing an Explicit Clause Prohibiting Unapproved Overtime**

22.     From 2002 to 2015, Lockheed Martin was awarded multiple defense contracts,

including the following:

(1)     CR2- CECOM Rapid Response (DAAB07-03-D-B009);

(2)     S3- Strategic, Services, Sourcing (W15P7T-06-D-E405);

(3)     R23G – Rapid Response Third Generation (W15P7T-10-D-D414; successor

contract to CR2-Final);

(4)     R2CSR – Rapid Response CSR (DAAB07-98-D-H503; predecessor contract to

CR2);

(5)     CNTPO-Counter Narco-Terrorism Program Office (W9113M-07-D-0006);

(6)     FAST (F09603-01-D-0207);

(7)     FAST 2 (FA8530-08-D-0008); and

(8)     DESP II (FA8222-06-D-0004).

23.     Each defense contract contained an explicit limitation on the use of overtime by

prime contractors or subcontractors. For example, the S3 contract states on page 41, § H-25

(emphasis added):

(1)     SECTION H - SPECIAL CONTRACT REQUIREMENTS -- S3 Contract

(2)     "H-25 HOURS OF WORK AND OVERTIME

(a)     Work within the Continental limits of the United States and its possessions

**shall not normally exceed eight (8) hours per day or forty (40) hours**

**per normal work week**. Work hours OCONUS shall correspond to hours

8

worked by comparable Government personnel, provided a maximum of forty hours per work week is not exceeded.

(b) **All overtime must be approved in advance by the issuing Contracting Officer**. Overtime will be paid at one and a half times the base labor rates on contract for such overtime worked:

    (i)   a. In excess of forty (40) hours per week

    (ii)  b. Emergency overtime in case of extreme emergency, where delay would endanger accomplishment of essential theatre missions, the contracting officer may authorize overtime."

24.    The CR2 contract contains identical language on page 27, § H-18, stating (emphasis added):

(1)    "H-18 HOURS OF WORK AND OVERTIME

(2)    **WORK WITHIN THE CONTINENTAL LIMITS OF THE UNITED STATES AND ITS POSSESSIONS SHALL NOT NORMALLY EXCEED EIGHT (8) HOURS PER DAY OR FORTY (40) HOURS PER NORMAL WORK WEEK.** WORK HOURS OCONUS SHALL CORRESPOND TO HOURS WORKED BY COMPARABLE GOVERNMENT PERSONNEL, PROVIDED A MAXIMUM OF FORTY (40) HOURS PER WORK WEEK IS NOT EXCEEDED.

(3)    **ALL OVERTIME MUST BE APPROVED IN ADVANCE BY THE ISSUING CONTRACTING OFFICER**. OVERTIME WILL BE PAID AT

9

ONE AND A HALF TIMES THE LOADED LABOR RATES ON CONTRACT

FOR SUCH OVERTIME WORKED:

(a)     (i) IN EXCESS OF FORTY (40) HOURS PER WEEK.

(b)     (ii) EMERGENCY OVERTIME IN CASE OF EXTREME

EMERGENCY, WHERE DELAY WOULD ENDANGER

ACCOMPLISHMENT OF ESSENTIAL THEATRE MISSIONS, THE

CONTRACTING OFFICER MAY AUTHORIZE OVERTIME."

25.     Finally, the initial R23G contract contains identical language on page 49, § H-25

(emphasis added):

(1)     "H-25 HOURS OF WORK

(a)     1.     **WORK WITHIN THE CONTINENTAL LIMITS OF THE**

**UNITED STATES AND ITS POSSESSIONS SHALL NOT**

**NORMALLY EXCEED EIGHT (8) HOURS PER DAY OR FORTY**

**(40) HOURS PER NORMAL WORK WEEK**. WORK HOURS

OCONUS SHALL CORRESPOND TO HOURS WORKED BY

COMPARABLE GOVERNMENT PERSONNEL, PROVIDED A

MAXIMUM OF FORTY HOURS PER WORK WEEK IS NOT

EXCEEDED.

(b)     2.     **EXTENDED WORKWEEK. CONTRACTOR WORKWEEK**

**IS FORTY (40) HOURS. THE CONTRACTOR WILL OBTAIN**

**WRITTEN APPROVAL BY THE GTL AND COR PRIOR TO**

**INCURRING ANY BILLABLE EXTENDED HOURS IN EXCESS**

> **OF THE CONTRACTOR WORKWEEK IN ACCORDANCE WITH**
> **AWARDED TASK ORDER HOURS**. ANY SERVICES THAT
> EXTEND BEYOND THE FORTY HOURS IN A GIVEN CALENDAR
> WEEK IS CONSIDERED EXTENDED AND WILL BE BILLED AT
> NON-PREMIUM RATES."

26. Relator reviewed the contracts R2CSR and CNTPO each contains the same or similar prohibitions on overtime.

27. Relator also believes that FAST, FAST 2, and DESP II contain the same or similar language.

28. Using substantially similar terms, each contract clearly and explicitly states that contractors and subcontractors may not submit claims for more than forty (40) hours a week. However, if circumstances require the prime contractor or subcontractors to work over forty hours a week, all overtime must be approved in advance by the issuing Contracting Officer. This restriction was enacted to contain costs and ensure maximum productivity of work performed.

## C. Relator Discovered that Lockheed Martin Allowed Subcontractors to Bill for Overtime in Blatant Disregard of the Defense Contracts

29. In 2010, Relator was working at Lockheed Martin as a Multifunctional Finance Manager, a role that required him to supervise analysts who reviewed the billings and performance of Lockheed Martin's subcontractors and the Defendant itself. Additionally, as part of his duties, Relator helped examine and approve claims from subcontractors, which were then submitted to the DoD or the Federal Government. During the 4th Quarter of 2010, Relator researched several of the defense contracts and discovered that they contained explicit limitations on the use of overtime without prior approval.

11

30. Relator was aware that some overtime might have been already been billed for without approval, so Relator raised this issue at the next manager meeting. Relator presented his concerns and Dan Monti, the Lockheed Martin Contracts Administrator, researched the overtime clauses from the defense contracts, confirming that Lockheed Martin was prohibited from submitting claims for overtime without prior approval. Relator was then tasked with reviewing some of the claims submitted to the DoD in order to determine Lockheed Martin's possible level of exposure. Specifically, Relator was asked to determine how much overtime had already been submitted and how much Lockheed Martin had overcharged the government as a result.

31. Relator began by examining a small subset of claims submitted by the subcontractors and paid in full by the U.S. Government. Using a limited search query, Relator immediately discovered that over 200,000 hours of unapproved overtime had already been billed from 2007 to the later part of 2010 by subcontractors through Lockheed Martin. This figure did not include Lockheed Martin's own overtime hours billed which would have been forwarded through Intercompany Work Transfer Authorization ("IWTA"); nor did Relator search the entire population of subcontractors' overtime hours.

32. Relator's research uncovered that overtime hours were a significant method for inflating claims under the defense contracts, which in the aggregate generated as much as $1 billion annually for Lockheed Martin and its subcontractors since 2002.

33. Relator was extremely disturbed by the extent that subcontractors were billing for overtime hours. Relator was also troubled by how similar some of the overtime hours were. For example, under CR2, a large group of employees for subcontractor R4, Inc. billed for extensive overtime hours:

12

- From September 30, 2007 until June 8, 2008, an employee by the name of Walter Arnold billed for exactly 84 hours every week (exactly 44 hours of overtime), resulting in a total of 1,496 hours of unauthorized overtime;

- From October 14, 2007 until June 22, 2007, an employee by the name of Eric Clauss billed for exactly 84 hours every week (exactly 44 hours of overtime), resulting in a total of 1,496 hours of unauthorized overtime;

- From September 30, 2007 until April 27, 2008, an employee by the name of Randy Dodd billed for exactly 84 hours every week (exactly 44 hours of overtime), resulting in a total of 1,364 hours of unauthorized overtime; and

- From October 21, 2007 until July 27, 2008, an employee by the name of Gary Dunham billed for exactly 84 hours every week (exactly 44 hours of overtime), resulting in a total of 1,704 hours of unauthorized overtime.

34.     Likewise, under S3, a group of employees for subcontractor L-3 Command & Control billed for extensive overtime hours:

- From November 9, 2008 until January 4, 2009, an employee by the name of Thomas Armstrong billed for exactly 84 hours every week (exactly 44 hours of overtime), resulting in a total of 396 hours of unauthorized overtime;

- From November 9, 2008 until March 1, 2009, and from March 8, 2009 until May 17, 2009, an employee by the name of Nathan Gridley billed for exactly 84 hours every week (exactly 44 hours of overtime), resulting in a total of 1,012 hours of unauthorized overtime;

13

- From September 27, 2009 until December 20, 2009, an employee by the name of John
  Hurley billed for exactly 84 hours every week (exactly 44 hours of overtime), resulting in
  a total of 572 hours of unauthorized overtime; and

- From September 20, 2009 until February 28, 2010, an employee by the name of Troy
  Moul billed for exactly 84 hours every week (exactly 44 hours of overtime), resulting in a
  total of 1,056 hours of unauthorized overtime.

35.   These are just some representative examples of the 80 subcontractors, hundreds of
employees and the hundreds of thousands of hours of unauthorized overtime billed to the DoD
and Federal Government by Defendant.

36.   Relator performed a quick analysis of this small sampling and determined that
206,064 hours of unauthorized overtime had already been billed for. Additionally, on average,
when overtime was billed, approximately 35% of the total time billed by these subcontractors
was billed for overtime hours.

37.   Had Lockheed Martin not submitted its subcontractors' unauthorized overtime
claims, but instead required its subcontractors to comply with the overtime provisions stipulated
in the defense contracts for which it was the prime contractor, Lockheed Martin would not have
been able to bill for excessive work hours. Excessive work hours are a method for fraudulently
inflating claims submitted to the federal government, wherein the prime contractor and the
subcontractor routinely and excessively bill for overtime. This fraudulent behavior proved to be
extremely lucrative for Lockheed Martin, since overtime could be paid at one and a half times
the base labor rate. However, overtime productivity suffers from diminishing returns, and as a

14

result overtime hours are typically far less useful than normal working hours due to the intensity and complexity of the labor.

## D.    Lockheed Martin Enacts a Scheme to Conceal the Overtime Claims so as to Defraud the Federal Government

38.    Upon discovering that Lockheed Martin had billed for hundreds of thousands of unauthorized overtime hours in violation of the defense contracts, Relator immediately reported his findings to his superiors at the next managers' meeting. At that meeting, Relator stated that all overtime must be approved by the Contracting Officer; and if not, would be considered disallowed costs and a refund would be required.

39.    At this meeting, Manager-Contracts Mr. Roe confirmed that some recent overtime had been billed which had not received prior approval. Mr. Roe also claimed that he would raise the issue of obtaining approval for this unauthorized overtime with the Contracting Officer to test his reaction; and then also raise the possibility that some overtime incurred in the past may not have been approved and seek the Contracting Officer's retroactive approval for that unauthorized overtime as well.

40.    At the next scheduled morning managers' meeting, Mr. Roe reported back to Relator, as well as Lockheed Martin Director Jeff Terhune and Project Managers Martin Delaney and Jeff Stavash, and claimed that he had spoken with the Contracting Officer regarding the issue of overtime both recently incurred and billed in the past, without ever mentioning the magnitude of the issue. The Contracting Officer replied that no overtime would be approved retroactively, and that the contracts clearly stated that any overtime anticipated must be approved before being incurred. In reaction, the Director and Managers at the meeting agreed that the issue needed further analysis, and there was no further discussion.

15

41. Relator and the other Lockheed Martin Director and Managers were aware that Lockheed Martin was required to issue credits for overbilling, and that Lockheed Martin's Director and Managers should have been aware of the overtime provisions in the contract and should not have submitted any bills containing overtime without prior approval.

42. In the event that unauthorized overtime was submitted to the DoD or the Federal Government, Relator and the other Lockheed Martin Director and Managers knew that this issue should be immediately disclosed to the Contracting Officer and that a refund should be issued. However, the other Lockheed Martin Director and Managers subsequently decided not to report this issue to the DoD Contracting Officer, and instead drafted a brief form letter to the subcontractors, requesting that they not bill for overtime in the future without prior approval. Relator is unaware whether the letters were ultimately sent to the subcontractors by the Purchasing Department. Relator never saw any internal memos discussing this issue or alerting Lockheed Martin employees as to the requirements of the DoD contracts.

43. Despite Relator's insistence, Defendant never disclosed the fact that millions of dollars in unauthorized overtime had been billed to the DoD and the Federal Government, the Contracting Officer was never notified that unauthorized overtime had already been billed for, and no refunds for unauthorized overtime were ever issued.

44. As a result of his perseverance, Defendant retaliated against Relator. Relator soon found himself transferred and demoted from his position as a financial manager to that of an analyst. As a manager, Relator's salary and funding came from Lockheed Martin itself. As an analyst, Relator was assigned to specific defense contracts, allowing for Relator to be easily dismissed once the defense contracts were terminated.

16

45.    Although he was initially hired to serve as a manager with the hope of further promotion, Relator's work was far less meaningful and offered fewer opportunities, if any, for advancement. Despite his excellent performance, in 2015 Relator was laid of by Defendant.

46.    In committing the fraudulent practices set forth in the preceding paragraphs, the Defendants:

        i.    Knowingly presented, or caused to be presented, to an officer or employee of the United States government and the state governments identified herein, false and fraudulent claims for payment and/or approval;

        ii.    Knowingly made, used or caused to be made or used, false records and/or statements to get a false or fraudulent claim paid or approved by the government or agencies identified herein;

        iii.    Conspired to defraud the government by getting a false or fraudulent claim allowed or paid; and

        iv.    Knowingly made, used or caused to be made or used, a false record to statement to conceal, avoid or decrease an obligation to pay or transmit or property to the United States government or state governments identified herein.

47.    In taking the actions set forth herein, the Defendants violated the Federal False Claims Act stated herein, including 31 U.S.C. § 3729, *et seq.*

## COUNT I
## SCHEME TO SUBMIT FRAUDULENT CLAIMS
## (31 U.S.C. § 3729(a)(1)(A))

48.     All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

49.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

50.     As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT II
## SUBMISSION OF CLAIMS CONTAINING
## FALSE EXPRESS OR IMPLIED CERTIFICATIONS
## (31 U.S.C. § 3729(a)(1)(A))

51.     All of the preceding allegations are incorporated herein.

52.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by defendant – material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

53.     As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States

18

is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT III
## FALSE RECORDS FOR PAYMENT
### (31 U.S.C. § 3729(a)(1)(B))

54.     All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

55.     Defendants submitted false records or statements to the Government representing that Defendants were entitled to payment and approval for unauthorized overtime.

56.     All such false records or statements were knowingly made to the Government to get false or fraudulent claims paid or approved by the Government.

57.     Defendant thus knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

58.     As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT IV
## FALSE CLAIMS CONSPIRACY
### (31 U.S.C. § 3729(a)(1)(C))

59.     All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

60.     Defendants entered into a conspiracy or conspiracies through their managers and employees to defraud the United States by submitting and obtaining approval and payment for false and fraudulent claims for unauthorized overtime for defense contract spending.

61.     As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT V
## REVERSE FALSE CLAIM
## (31 U.S.C. § 3729(a)(1)(G))

62.     All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

63.     By virtue of the acts alleged herein the Defendants knowingly made, used or caused to be made or used false records or false statements that are material to an obligation to pay or transmit money to the Government, and did refund or repay money due the United States.

64.     As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT VI
## RETALIATION
## (31 U.S.C. § 3730(h))

65.     All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

20

66.     By virtue of the acts alleged herein, Defendants threatened, harassed, and/or dismissed, and/or discriminated against, Relator in the terms and conditions of his employment after he lawfully reported what he believed to be fraudulent conduct or wrongdoing to his superiors in violation of 31 U.S.C. § 3730(h).

67.     Relator seeks compensatory damages and other appropriate statutory relief pursuant to this section.

## PRAYER FOR RELIEF

WHEREFORE, for each of these claims, the Qui Tam Plaintiff requests the following relief from Defendant as to the federal claims:

A.     Three times the amount of damages that the Government sustains because of the acts of Defendants;

B.     A civil penalty of $11,000 for each violation;

C.     An award to the Qui Tam Plaintiff for collecting the civil penalties and damages;

D.     Award of an amount for reasonable expenses necessarily incurred;

E.     Award of the Qui Tam Plaintiff's reasonable attorneys' fees and costs;

F.     Interest;

G.     Compensation, including reinstatement with seniority status, 2 times the amount of back pay, front pay, interest on the back pay, and compensation for special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, due Relator for Defendant's retaliation;

H.     Such further relief as the Court deems just.

21

## JURY DEMAND

Relator hereby demands trial by jury.

Dated: September 9, 2015

Respectfully submitted,

By: _____

David S. Stone
Robert A. Magnanini
STONE & MAGNANINI LLP
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
Tel:   (973) 218-1111
Fax:   (908) 464-3010 or (908) 464-1020
dstone@stonemagnalaw.com
rmagnanini@stonemagnalaw.com

*Attorneys for Plaintiff-Relator*

22