## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>*ex rel*. **GREGORY BORIS**,<br><br> Plaintiff,<br><br> v.<br><br>**LOCKHEED MARTIN CORPORATION**,<br><br> Defendant. | **Case No: 2:15-cv-06769-JLL-JAD** |

## FIRST AMENDED *QUI TAM* COMPLAINT
## AND DEMAND FOR JURY TRIAL

On behalf of the United States of America and by his undersigned counsel, Relator Gregory Boris brings this First Amended *Qui Tam* Complaint against Lockheed Martin Corporation ("LMC" or the "Company"), alleging as follows:

## I.    INTRODUCTION

1.    This is an action to recover treble damages and civil penalties on behalf of the United States from Defendant for knowingly and/or recklessly presenting or causing to be presented false claims to the U.S. Government through the Department of Defense ("DoD") in violation of the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*

2.    From the present back to at least 2007, and perhaps back as far as 2002, LMC has knowingly billed the Government for unauthorized overtime in violation of clear provisions in certain defense contracts to which it is a party. The Company has failed to report or halt billing for overtime, and failed to return the payments for overtime that it had already improperly obtained. As a result, the United States has suffered damages potentially exceeding $100,000,000 in unauthorized overtime costs.

3.      From 2002 to 2015, LMC was awarded multiple contracts by DoD. As prime contractor, Defendant was required to initiate, organize, and supervise the implementation of these contracts by hiring and managing subcontractors. Defendant was required to ensure that all work was done properly, on-time, and according to contract specifications. Defendant was also required to authenticate all claims and bills before submitting them to DoD for payment.

4.      However, beginning in at least 2007, and likely since 2002, Defendant's subcontractors and components began routinely billing for thousands of hours of overtime, without proper authorization and without identifying them as overtime. Defendant submitted unauthorized and undisclosed overtime bills to DoD, mixed in with other claims for payment and without disclosing that they had not been approved in advance, as required by the contracts. These unauthorized claims were then paid by DoD.

5.      In October 2010, in the course of reviewing work on a new assignment, Relator examined the contracts and discovered that they prohibited LMC and its subcontractors from billing for overtime without the prior approval of the relevant Contract Officer. Relator found tens of thousands of records showing that Defendant had routinely submitted claims for unauthorized overtime.

6.      Relator reported these improper claims to several LMC managers and specialists, including: Daniel Monti, Contract Administrator; Gregory Roe, Manager-Contracts; Jeff Terhune, Director-Program Management Office; and Jeff Stavash and Martin Delaney, both Program Managers.

7.      After making his report, Relator was asked by Gregory Roe and Jeff Terhune to determine how much unauthorized overtime had been billed and the extent of LMC's exposure.

8.      Relator reviewed and examined a small segment of the billings that were in

LMC's Vendor Invoice Processing ("VIP") system and determined that over 200,000 hours in overtime had already been billed and paid.

9.      Relator's information goes back only to 2007 because his queries of LMC's VIP system disclosed data from no year earlier than that year. Relator believes the database was initiated that year. Relator was unable to determine conclusively whether LMC billed and was paid for unauthorized overtime *before* the initiation of the system.

10.      Furthermore, Relator discovered that LMC was continuing to bill for overtime, without prior approval.

11.      Relator reported his findings to the same group of LMC managers and specialists at a managers' meeting on October 25, 2010.

12.      Following Relator's revelations, LMC employee Gregory Roe (Manager-Contracts) spoke with one of the government Contract Officers supervising the contracts at issue and inquired whether recently-incurred unauthorized overtime could be approved. As Roe reported at the next managers' meeting on November 1, the Contract Officer told him that the overtime would not be approved. Roe then asked whether previously submitted unauthorized overtime could be approved after the fact, and the Contract Officer told him that any overtime which had not been approved beforehand would not be approved after the fact.

13.      Relator inquired about how the overtime issue would be addressed moving forward, and was told only that the issue was under review.

14.      However, by that time LMC had apparently already decided that, instead of following proper procedure and reporting to the relevant DoD Contract Officers that the Company had billed at least 200,000 hours of unauthorized overtime, it would conceal this information. No actions were taken to address past billing and, in fact, no procedures were

implemented or even developed to address the issue moving forward.

15.    Because LMC was acting as prime contractor on these contracts it was able to bill all costs incurred internally as well as all costs incurred by its subcontractors. As a result, LMC increased its sales by hundreds of millions of dollars annually not only by recognizing all subcontractor costs as sales but by adding mark-up factors on all costs to offset internal overhead, General and Administrative costs, and other miscellaneous expenses. These contracts were extremely profitable from a Return on Invested Capital perspective, since there was virtually no investment required but they provided consistent and ongoing profits to LMC.

16.    Because his discovery of the unauthorized overtime risked upsetting this gravy train, LMC retaliated against Relator. He was transferred to non-managerial roles and then ultimately laid off. Other employees who knew of the fraud, and others who were in a position to find out about it, have also been separated or transferred.

17.    LMC has actual knowledge that it has illegally billed the DoD for at least over 200,000 hours of unauthorized overtime, and that the improper billings would have been disallowed, requiring the issuance of refunds to the Government. LMC has concealed this information, preferring instead to retain the profit from the unauthorized overtime billings.

18.    Upon information and belief, LMC has caused a total actual loss to the United States in excess of $100,000,000.

### III.   JURISDICTION AND VENUE

19.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C §§ 1331 and 1345, and 31 U.S.C § 3732(a)-(b).

20.   This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C § 3732(a)-(b), because Defendant is found, resides in, and/or transacts business in this jurisdiction.

21.   Venue is appropriate in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 139l(b)(l) and (2). The acts complained of herein occurred throughout the United States and within the District of New Jersey.

22.   The original Complaint in this matter was filed *in camera* and under seal. On August 24, 2017, the Court ordered that the matter be unsealed and the Complaint served on LMC.

### IV.   DEFENDANT

23.   LMC is a Maryland corporation with its principal place of business at 6801 Rockledge Drive, Bethesda, MD 20817.

24.   LMC is a global security and aerospace company principally engaged in research, development, and manufacture of advanced technology systems and services for defense applications.

25.   LMC develops, manufactures, and provides services throughout the United States, and has maintained significant operations regarding Mission Systems and Training in Cherry Hill and Mt. Laurel within the State of New Jersey at all times relevant to this matter.

## V.     RELATOR

26.     Relator Gregory Boris is a citizen of the United States and at all relevant times has been a resident of the State of New Jersey.

27.     Relator has extensive experience, both in the defense industry and in various financial positions: with General Electric (eighteen years, seven of which were spent in a defense industry component); with Boeing (two years in a defense component); and with Lockheed (over five years). While at General Electric he rose to Senior Audit Manager and was responsible for audits of defense and commercial businesses. He also headed GE Capital's audit group for more than four years.

28.     Relator was employed by LMC from 2010 to 2015 as a Multi-Functional Finance Manager and Multi-Functional Senior Financial Analyst, working at the Company's facility in Wall Township, New Jersey. Relator's responsibilities included oversight of several of the contracts at issue herein.

29.     Relator has direct knowledge of the facts set forth herein and is the original source of same.

30.     Prior to the unsealing of this action by the Court there was no public disclosure, relevant under 31 U.S.C. § 3730(e), of the "allegations or transactions" alleged in the original Complaint or this First Amended Complaint. Relator voluntarily disclosed substantially all evidence and information in his possession to the United States Attorney for the District of New Jersey prior to filing the original Complaint.

# VI.    FACTS

## A.    LMC and the Role and Duties of a Prime Contractor

31.    Lockheed Martin Corporation was formed in 1995 when the Lockheed Corporation merged with the Martin Marietta Corporation. Since then, LMC has grown to become the largest defense contractor in the world, focusing on aerospace, defense, and security products and services. In 2014, LMC generated $45.6 billion in net sales, 79% of which were made to the Government. For 2017, net sales were $51 billion, of which 69% were made to the Government.

32.    When operating as a prime contractor, LMC enters into a direct contract with DoD or another agency of the Government to provide materials, equipment, or services. As a prime contractor, LMC is required to assign secondary jobs and responsibilities to lower-tier subcontractors as necessary to complete the contract. When serving as a prime contractor, LMC also provides information regarding roles and responsibilities to subcontractors, and reviews any materials, equipment, or services provided by subcontractors to confirm that they meet the contracting standards.

33.    Most importantly here, as a prime contractor LMC is required to examine and certify all claims presented to the Government pursuant to the contract, to ensure that all work was properly done and that all claims are accurate and meet contract standards and requirements.

## B.    LMC Served as the Prime Contractor on the Contracts, Each of Which Contains an Explicit Clause Prohibiting Unapproved Overtime

34.    From 2002 to 2015, LMC was awarded multiple contracts by DoD, including at least the following:

a.   S3-Strategic, Services, Sourcing (Wl5P7T-06-D-E405) (attached hereto as **Exhibit A**);

b.   CR2-CECOM Rapid Response (DAAB07-03-D-B009) (attached hereto as **Exhibit B**);

    c.   R23G-Rapid Response
          (W15P7T-09-D-F005) (attached hereto as **Exhibit C**);[1]

    d.   R2CSR-Rapid Response CSR
          (DAAB07-98-D-H503, predecessor contract to CR2);

    e.   CNTPO-Counter Narco-Terrorism Program Office
          (W9113M-07-D-0006);

    f.   FAST (F09603-0l-D-0207);

    g.   FAST 2 (FA8530-08-D-0008); and

    h.   DESP II (FA8222-06-D-0004).

(collectively, the "Contracts").

35.    As will be seen from the Exhibits, the Contracts were Indefinite Delivery/Indefinite Quantity (ID/IQ) vehicles, and were mostly of the Time and Material (T&M) and Cost Plus Fixed Fee (CPFF) types. *See* **Exhibit D**, Garrett, Gregory A., "IDIQ Contracting: The Good, the Bad, & the Ugly," Presentation Prepared for the National Contract Management Association (NCMA), Jan. 2013.

36.    Contracts of this nature are extremely susceptible to the incurrence of excess costs, if not monitored closely and restricted in some fashion. *See id.* at 9 ("IDIQ is not a definitive contract, thus may have potential open financial liabilities over multiple years"), 10 ("Major cost growth, schedule delays, and cost overruns [can] occur").

37.    As one way of controlling costs, each of the Contracts here contains an explicit limitation on the use of overtime by prime contractors or subcontractors.

---

[1] The award of this Contract was challenged by another vendor. LMC prevailed, and the Contract was reissued as W15P7T-10-D-D414.

38.     For example, the S3 contract states:

H-25   HOURS OF WORK AND OVERTIME

1.      Work within the Continental limits of the United States and its possessions *shall not normally exceed eight (8) hours per day or forty (40) hours per normal work week.* Work hours OCONUS[2] shall correspond to hours worked by comparable Government personnel, *provided a maximum of forty hours per work week is not exceeded*.

2.      *All overtime must be approved in advance by the issuing Contracting Officer.* Overtime will be paid at one and a half times the base labor rates on contract for such overtime worked:

a.      In excess of forty (40) hours per week

b.      Emergency overtime in case of extreme emergency, where delay would endanger accomplishment of essential theatre missions, the contracting officer may authorize overtime.

**Exhibit A**, at 41 (emphasis added).

39.     The CR2 contract contains identical language. *See* **Exhibit B**, at 27.

40.     The initial R23G contract contains substantially similar language:

H-25   HOURS OF WORK

1.      *WORK WITHIN THE CONTINENTAL LIMITS OF THE UNITED STATES AND ITS POSSESSIONS SHALL NOT NORMALLY EXCEED EIGHT (8) HOURS PER DAY OR FORTY (40) HOURS PER NORMAL WORK WEEK. WORK HOURS OCONUS SHALL CORRESPOND TO HOURS WORKED BY COMPARABLE GOVERNMENT PERSONNEL, PROVIDED A MAXIMUM OF FORTY HOURS PER WORK WEEK IS NOT EXCEEDED.*

2.      EXTENDED WORKWEEK. CONTRACTOR WORKWEEK IS FORTY (40) HOURS. *THE CONTRACTOR WILL OBTAIN WRITTEN APPROVAL BY THE GTL[3] AND COR[4] PRIOR TO INCURRING ANY BILLABLE EXTENDED HOURS IN EXCESS OF THE CONTRACTOR WORKWEEK IN ACCORDANCE WITH AWARDED TASK ORDER HOURS.* ANY SERVICES THAT EXTEND BEYOND THE FORTY HOURS IN A GIVEN CALENDAR WEEK IS [*sic*] CONSIDERED EXTENDED AND WILL BE BILLED AT NON-PREMIUM RATES.

---

[2] "Outside of the Continental United States."
[3] "Group Team Leader."
[4] "Contracting Officer's Representative."

**Exhibit C**, at 48 (emphasis added).

41.     The R2CSR and CNTPO Contracts, which Relator has personally seen, also contain substantially similar language.

42.     Relator believes that the FAST, FAST 2, and DESP 11 Contracts contain substantially similar language.

43.     Using substantially similar terms (noted under separate paragraphs as "Special Provisions"), the Contracts clearly and explicitly state that contractors and subcontractors may not submit claims for overtime work unless that overtime was approved by the Contracting Officer prior to its being incurred.

**C.     Relator Discovered that LMC
        Allowed Subcontractors to Bill for Overtime
        in Blatant Disregard of the Contracts**

44.     In 2010, Relator was working at LMC as a Multifunctional Finance Manager, a role that required him to supervise analysts who reviewed the billings and performance of subcontractors and of LMC itself. As part of these duties, Relator helped examine and approve claims from subcontractors when his analysts were not available. The claims would then be submitted to the Government.

45.     During the 4th Quarter of 2010, Relator researched several of the Contracts and discovered that they contained the explicit requirements for prior approval of overtime set forth above.

46.     Relator was aware that some overtime had already been billed without approval, so he raised this issue at the managers' meeting on October 18, 2010. Relator was then tasked with reviewing some of the claims submitted to DoD in order to determine LMC's possible exposure. Specifically, Relator was asked to determine quickly, and using the VIP system only, how much unauthorized overtime had already been submitted and how much LMC had

overcharged the Government as a result.

47.     Relator began by examining a small subset of claims – containing thousands of lines, each representing a week in which overtime hours were claimed – submitted by the subcontractors on the CR2 and S3 Contracts and paid in full by DoD.[5] In just this small sample, Relator immediately discovered that between 2007 and 2010, over 200,000 hours of unapproved overtime had been billed by LMC on behalf of its subcontractors.[6] Approximately 35% of the total time billed in this small sample was billed for overtime hours.

48.     Relator's research revealed that the use of overtime was a significant method for inflating claims under the Contracts, possibly generating in the aggregate tens of millions of dollars annually for LMC and its subcontractors since at least 2007:

   a.  Under the CR2 Contract, 157,174.7 hours of unauthorized overtime were billed in 4,523 individual labor claims. *See* **Exhibit E** hereto.[7]

   b.  Under the S3 Contract, 47,671.6 hours of unauthorized overtime were billed in 5,162 individual labor claims. *See* **Exhibit F** hereto.[8]

49.     All of the costs shown in Exhibits E and F were actually billed to, and paid by, the Government. Further, these Exhibits reflect only a fraction of the labor costs incurred on the two Contracts – and thus reflect an even smaller fraction of the total labor costs incurred on *all* the Contracts. The Exhibits also do not include additional markups applied by Lockheed that were subsequently billed to the Government.

50.     Approximately 80 subcontractors and hundreds of employees billed hundreds of

---

[5] This subset was derived by Ryan Erdei and Plaintiff, who used the existing query tool available under the SWIFT accounting system to sort the entire VIP database for Contracts S3 and CR2 for all labor hours that exceeded 40 hours per week. All results were actual as processed.

[6] It is important to note that this figure does not include LMC's own overtime hours, or those of subcontractors of other Lockheed components or subcontractors who did not use the VIP system.

[7] Exhibit E is a .pdf copy of the results of Relator's query of the company's VIP database. The original query output as an Excel file.

[8] Exhibit F is a .pdf copy of the results of Relator's query of the company's VIP database. The original query output as an Excel file.

thousands of unauthorized overtime hours to DoD through LMC, over the lifespans of the Contracts.

51.    Lockheed recognized as revenue all costs billed to the Government under these Contracts, and recorded associated profit based on these costs.

52.    Between 2010 and 2013 alone, yearly billings from the Contracts aggregated to over $1 billion, and continued into the hundreds of millions of dollars through at least 2015.

53.    As prime contractor, LMC was responsible for ensuring that its own bills and those of its subcontractors complied with the overtime provisions of the Contracts. By neglecting or intentionally ignoring this responsibility, LMC was able to bill for and did receive from the Government many millions of dollars to which it was not entitled.

**D.    <u>LMC's Scheme to Defraud the Government</u>**

54.    Upon discovering that LMC had billed for hundreds of thousands of unauthorized overtime hours in violation of the Contracts, Relator immediately reported his findings to his superiors at a managers' meeting on October 25, 2010.

55.    At that meeting, Relator reported that all of the Contracts required prior approval of overtime by the Contracting Officer, and that unauthorized overtime would be considered a disallowed cost – meaning that any payments already received for such unauthorized overtime would have to be refunded. Daniel Monti, LMC's Contracts Administrator, confirmed this.

56.    Thus, by at least October 25, 2010, LMC managers were aware of the overtime provisions in the Contracts; were also aware that unauthorized overtime had already been billed and paid; and should have taken steps to ensure that no further bills containing unauthorized overtime were submitted to the Government. As of that date, LMC managers also knew that any bills containing unapproved overtime that had already been submitted should be immediately

12

disclosed to the relevant Contracting Officers, and that any payments already received for such overtime should be immediately refunded.

57.     At the October 25, 2010 meeting, after Relator made his presentation, Manager-Contracts Gregory Roe stated that he would ask a Contracting Officer whether recently incurred overtime could be approved *ex post facto*, and would also ask whether unapproved overtime that "may have" already been billed and paid for could also be retroactively approved.

58.     Just before the start of the next scheduled managers' meeting, on November 1, 2010, Director Jeff Terhune held a brief, separate meeting with Roe, Relator, and Project Managers Martin Delaney and Jeff Stavash to discuss the overtime issue. Roe said that he had spoken with the Contracting Officer, but indicated that he had not mentioned the magnitude of the issue. According to Roe, the Contracting Officer had confirmed that ***no overtime would be approved retroactively***.

59.     Terhune and Roe stated that the issue needed further analysis, and there was no further discussion of the issue once the full managers' meeting started.

60.     At some point shortly after the November 1 meeting, a brief form letter was drafted for the Procurement Department to use "to remind" subcontractors of their obligations under the S3 Contract and "clarifying" that the overtime rules were "applicable for both exempt and non-exempt employees with the understanding that overtime for exempt personnel will be paid as straight time only." *See* form letter, attached as **Exhibit G** hereto.

61.     Relator is unaware whether the letter was ever even sent to any subcontractor by the Procurement Department, and suspects that it was "window dressing," created only to mollify him. Relator never saw any internal memos discussing the issue or alerting LMC employees as to the requirements of the DoD Contracts.

62.     Despite Relator's insistence, LMC has never to his knowledge disclosed that millions of dollars of unauthorized overtime has been billed to the Government, and has never issued any refunds. In this regard, it should be remembered that LMC did not break out or identify overtime hours on the invoices and vouchers it presented to the Government. The Government relied entirely on LMC to adhere to the Contract terms, and to ensure that any billed-for overtime had been pre-approved.

**E.      LMC's Retaliation**

63.     An ethical company might have rewarded Relator's efforts to expose and correct fraud – but not LMC. Instead, LMC lashed out self-protectively by retaliating against Relator and all others who knew or may have known about the violations.

64.     Despite having received two Personal Achievement Awards and one President's Award from the Company in 2010-11, by 2012 Relator found himself relegated to working on "Special Projects" – the corporate world's "kiss of death," since once a "special project" is concluded the employee is no longer needed. In other words, Relator was being set up for an early exit.

65.     Relator worked on several of these special projects, including a system conversion, a change in accounting application, and the investigation and resolution of a large overpayment to a subcontractor. All had definite end points.

66.     Fortunately, as his special projects concluded, new work surfaced for which Relator's experience made him ideally suited, so the Company kept him on. However, as part of LMC's continued effort to isolate him, his classification was changed and he was instructed to work from home.

67.     Relator was finally laid off in 2015.

68.     Relator is aware of at least seven other employees who knew or were in position to know about the fraud and have been involuntarily separated from the Company since Relator made his disclosures.[9]

69.     Other employees who would have known about the fraud have been transferred or promoted to different jobs within the Company, and a few have voluntarily left LMC.

70.     Only one employee in Relator's original Finance unit is still in the position he held at the time of Relator's discoveries.

**COUNT I**
**SCHEME TO SUBMIT FRAUDULENT CLAIMS**
**(31 U.S.C. § 3729(a)(l)(A))**

71.     Relator re-alleges and incorporates by reference each and every allegation set forth above with the same force and effect as if fully set forth herein.

72.     As more particularly set forth above, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(l)(A).

73.     As a result of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Relator therefore respectfully requests an order awarding the United States treble damages plus a civil monetary penalty for each violation, and awarding Relator the maximum award permitted under 31 U.S.C. § 3730(d).

---

[9] Jeff Terhune, Mark Pensiero, Ryan Erdei, Janice Affilitto, Betty Reyes, Carol Manolio, and Judy Burke have been involuntarily separated from LMC. Relator has no information as to the current employment status of Greg Roe, Martin Delaney, or Jeff Stavash.

**COUNT II**
**SUBMISSION OF CLAIMS CONTAINING**
**FALSE EXPRESS OR IMPLIED CERTIFICATIONS**
**(31 U.S.C. § 3729(a)(l)(A))**

74.     Relator re-alleges and incorporates by reference each and every allegation set forth above with the same force and effect as if fully set forth herein.

75.     As more particularly set forth above, Defendant knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by Defendant – material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(l)(B).

76.     As a result of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Relator therefore respectfully requests an order awarding the United States treble damages plus a civil monetary penalty for each violation, and awarding Relator the maximum award permitted under 31 U.S.C. § 3730(d).

**COUNT III**
**FALSE RECORDS FOR PAYMENT**
**(31 U.S.C. § 3729(a)(l)(B))**

77.     Relator re-alleges and incorporates by reference each and every allegation set forth above with the same force and effect as if fully set forth herein.

78.     As more particularly set forth above, Defendant submitted false records or statements to the Government representing that Defendant was entitled to payment and approval for unauthorized overtime.

79.     All such false records or statements were knowingly made to the Government to get false or fraudulent claims paid or approved by the Government.

80.     As a result of Defendant's acts, the United States has been damaged, and

continues to be damaged, in a substantial amount to be determined at trial. Relator therefore respectfully requests an order awarding the United States treble damages plus a civil monetary penalty for each violation, and awarding Relator the maximum award permitted under 31 U.S.C. § 3730(d).

## COUNT IV
## FALSE CLAIMS CONSPIRACY
## (31 U.S.C. § 3729(a)(I)(C))

81.     Relator re-alleges and incorporates by reference each and every allegation set forth above with the same force and effect as if fully set forth herein.

82.     As more particularly set forth above, Defendant, through its managers and employees, conspired with numerous unnamed subcontractors to defraud the United States by submitting and obtaining approval and payment for false and fraudulent claims for unauthorized overtime.

83.     As a result of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Relator therefore respectfully requests an order awarding the United States treble damages plus a civil monetary penalty for each violation, and awarding Relator the maximum award permitted under 31 U.S.C. § 3730(d).

## COUNT V
## KNOWINGLY AND IMPROPERLY AVOIDING AN OBLIGATION
## TO PAY OR TRANSMIT MONEY TO THE GOVERNMENT
## ("REVERSE FALSE CLAIM")
## (31 U.S.C. § 3729(a)(I)(G))

84.     Relator re-alleges and incorporates by reference each and every allegation set forth above with the same force and effect as if fully set forth herein.

85.     By means of the fraudulent acts more particularly set forth above, Defendant

obtained overpayments from, the Government.

86.     Under 42 U.S.C. § 1320a-7k(d), Defendant was obligated to report and return each overpayment, and to notify the paying agency in writing of the reason for the overpayment, "by the later of (A) … 60 days after the date on which the overpayment was identified; or (B) the date any corresponding cost report is due …."

87.     42 C.F.R. § 401.305(a)(2) provides: "A person has identified an overpayment when the person has, or should have through the exercise of reasonable diligence, determined that the person has received an overpayment and quantified the amount of the overpayment."

88.     Relator identified overpayments to Defendant as of October 25, 2010. To date, no such overpayments have been returned or even reported to DoD.

89.     Defendant has therefore knowingly and improperly avoided an obligation to pay or transmit money to the Government, in violation of 31 U.S.C. § 3729(a)(l)(G).

90.     As a result of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Relator therefore respectfully requests an order awarding the United States treble damages plus a civil monetary penalty for each violation, and awarding Relator the maximum award permitted under 31 U.S.C. § 3730(d).

## COUNT VI
### RETALIATION
### (31 U.S.C. § 3730(h))

91.     Relator re-alleges and incorporates by reference each and every allegation set forth above with the same force and effect as if fully set forth herein.

92.     By means of the acts more particularly set forth above, Defendant threatened, harassed, dismissed, and/or discriminated against Relator in the terms and conditions of his

employment after he lawfully reported to his superiors conduct that he believed to be fraudulent and violative of 31 U.S.C. § 3730(h).

93.     By reason of such retaliation, Relator has been damaged, and continues to be damaged, in a substantial amount to be proven at trial. Relator therefore respectfully requests an order awarding him all relief necessary to make him whole, including but not limited to reinstatement with seniority status; twice the amount of back pay he is owed; interest on the back pay; front pay; and compensation for the special damages he has sustained as a result of the retaliation, including litigation costs and reasonable attorney fees, pursuant to 31 U.S.C. § 3730(h)(2).

94.     This claim is brought within the limitations periods set forth in 31 U.S.C. § 3730(h)(3)

## PRAYER FOR RELIEF

**WHEREFORE**, Relator respectfully requests that this Court grant the following relief from Defendant:

A.     That Defendant be ordered to cease and desist from violating 31 U.S.C. § 3729;

B.     That this Court enter judgment against Defendant in an amount equal to the damages the United States has sustained due to Defendant's actions, trebled, plus a civil penalty for each claim presented, pursuant to 31 U.S.C. § 3729(a) as amended by the Federal Civil Penalties Inflation Adjustment Acts of 1990 and 2015;

C.     That Relator be awarded the maximum amount allowed under 31 U.S.C. § 3740(d);

D.     That Relator be awarded all costs of this action, including attorneys' fees and expenses;

E.     That this Court enter judgment against Defendants, pursuant to 31 U.S.C. § 3730(h)(2), in an amount and of a kind sufficient to make Relator whole, including but not limited to reinstatement with seniority status, twice the amount of back pay he is owed, interest on the back pay, front pay, and compensation for special damages sustained as a result of Defendant's retaliation, including

litigation costs and reasonable attorneys' fees; and

F.      Such other and further relief as this Court deems equitable and just.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Relator demands trial by

jury on all questions of fact raised by the Complaint.

Dated: April 13, 2018                           Respectfully submitted,

**JTB LAW GROUP, LLC**

*/s/ Jason T. Brown*
Jason T. Brown
155 2nd Street, Suite 4
Jersey City, NJ 07302
(877) 561-0000 (office)
(855) 582-5297 (fax)
*jtb@jtblawgroup.com*

*Attorneys for Relator Gregory Boris*

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2018, I caused a true copy of the First Amended *Qui Tam* Complaint in the matter captioned *United States of America ex rel. Gregory Boris v. Lockheed Martin Corporation*, No: 2:15-cv-06769-JLL-JAD, along with the Exhibits thereto, to be filed on the Court's CM/ECF system, thereby serving same upon all counsel of record in the matter.

_____
Patrick S. Almonrode